UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | 2:11-CR-00100-GZS-2 |
| | ) | |
| TERRELL CAMPBELL | ) | |

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | 2:11-CR-00100-GZS-3 |
| | ) | |
| ESLEY PORTEOUS | ) | |

**RECOMMENDED DECISION**

The United States of America has charged Defendants Terrell Campbell and Esley Porteous with Conspiracy to Possess Fifteen or More Counterfeit Access Devices and Possession of Fifteen or More Counterfeit Access Devices. Defendant Campbell faces an additional charge of Use of One or More Counterfeit Access Devices. These acts are prohibited under Title 18 of the United States Code, section 1029. Defendants Campbell and Porteous have filed motions to suppress evidence of the indicted crimes gathered during an investigatory traffic stop, some of which was ultimately seized pursuant to a warrant. The Court referred the motions for report and recommendation. I conducted a hearing on November 17, 2011, and now offer the Court the following proposed findings of fact and recommended disposition.

PROPOSED FINDINGS OF FACT

The United States (the "Government") bears the burden of demonstrating that the investigation underlying its prosecution comported with constitutional requirements. Mincey v. Arizona, 437 U.S. 385, 390-91 (1978) (warrantless searches); Lego v. Twomey, 404 U.S. 477, 489 (1972) (voluntariness of statements); see also United States v. Lopez, 380 F.3d 538, 543

(1st Cir. 2004) (vehicle searches); United States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006) (brief investigative stops); United States v. Melendez, 301 F.3d 27, 32 (1st Cir. 2002) (consent to search). To satisfy this burden, the United States called to the witness stand three law enforcement officers and introduced into evidence five exhibits, all admitted. Defendants offered no testimony of their own in support of their motions, but cross-examined the testifying officers and introduced seven exhibits, five of which were admitted, two of which (police reports) were never offered. The sworn testimony and exhibits demonstrate, by a preponderance of the evidence, the following facts concerning the detention and questioning of Defendants and the search of the subject vehicle.

On May 21, 2011, at approximately 11 a.m., Patrol Officer Craig Hebert of the Scarborough Police Department responded to a report of suspicious conduct at a Bull Moose store in Scarborough, Maine. Upon his arrival at the store, Officer Hebert joined another officer identified only as Officer Dalton and participated with Officer Dalton in an interview of two Bull Moose clerks. Based on this interview, Officer Hebert formed an understanding that three black men, all traveling in the same SUV with a New York registration, entered the store, in succession, seeking to purchase video game systems. The first man successfully paid $700 for two systems using a credit card and departed. The second man attempted a similar purchase but both of the credit cards he presented were declined. During or after the declination process, the clerks observed that the name on both of the declined credit cards was the same name that was on the credit card presented by the first man. Subsequently, the third man entered the store and expressed an interest in purchasing one or more game systems. One of the clerks offered an excuse for why no additional game systems could be sold and suggested that the man try the Toys R Us store in South Portland. The clerks told the officers that the men departed together in

the same dark-colored SUV and provided a registration number. They told the officers that the men were likely headed to either Toys R Us or Babies R Us. During this interview, Officer Hebert relayed to dispatch a description of the vehicle and its purported registration number and also indicated that the vehicle was occupied by three black males.

Patrol Officer Kevin Gerrish of the South Portland Police Department responded to a dispatch call to look for the SUV in the Toys R Us parking lot. He identified an unoccupied vehicle matching the description, though two of the registration numbers were reversed, and reported the same through dispatch. Officer Gerrish then waited in the parking lot as the Scarborough officers continued their investigation at Bull Moose. Before long, three black males exited the store carrying bags of merchandise. Based on the description of the vehicle and its occupants provided by the Bull Moose clerks, Officer Gerrish reasonably concluded that these were the men they were looking for. The men entered the vehicle and departed the store premises. Officer Gerrish followed in his cruiser and called dispatch to determine whether he should stop the vehicle. Either dispatch or Officer Hebert responded in the affirmative and Officer Gerrish activated his lights. This process also activated a cruiser-mounted video recording device and audio devices on Officer Gerrish's person.[1] The driver of the SUV pulled into the parking lot of a hotel, where Officer Gerrish proceeded to investigate, prior to the arrival of other officers. Officer Gerrish understood that the suspects had been at Bull Moose and that there was suspicion of fraudulent use of credit cards.

Officer Gerrish approached the SUV and the driver partially rolled down the window. Officer Gerrish requested of the driver his license, the vehicle's registration, and proof of insurance. He also requested identification from the two passengers. The passengers, Defendants Campbell and Porteous, presented valid identification. However, the driver, non-

---

[1] The audio and video are preserved in Defendants' Exhibits 1, 2, and 5.

moving co-defendant Michael Barnes, said he was unable to produce a driver's license.  On the video, beginning at 11:56:10, Officer Gerrish can be heard to tell the three occupants that there was report that they had trouble with some credit cards at Bull Moose.  Their response to this line of inquiry was evasive, including a statement by one occupant that he "wasn't in no Bull Moose," and a general group confirmation of this assertion.  Barnes also indicated to Officer Gerrish that he had a New York driver's license and he stated that it might be suspended.  Barnes informed Gerrish that the vehicle was a rental and responded with a "yeah" when asked if they were on vacation in the area.

  According to Officer Gerrish, during this preliminary exchange he detected the scent of marijuana emanating from the vehicle.  Officer Gerrish reported being familiar with the distinctive odor of marijuana based on his training and years of experience in the field, including participation in what he described as a "controlled burn" when he was at the Academy.  Counsel for Defendants cross-examined Officer Gerrish on his assertion that he smelled marijuana, suggesting that this assertion was false.  However, based on my observation of the officer's testimony, I find that Officer Gerrish did subjectively believe that he could smell the odor of marijuana.  After roughly four minutes of speaking to Barnes through the window of the vehicle,[2] Officer Gerrish instructed Barnes to exit and he continued to speak with Barnes apart from the other vehicle occupants.  Officer Gerrish asked where the men were staying in the area and Barnes responded that they were passing through, traveling from New Hampshire to Rhode Island and had stopped off in the Portland area.

---

[2]   This measure of time is drawn from the video evidence, Defendants' Exhibit 5.

Officer Hebert arrived at the hotel parking lot shortly after Officer Gerrish stopped the vehicle. Within seconds of Barnes's exit from the vehicle[3], Officer Hebert approached and asked the person in the rear passenger-side seat to exit the vehicle. This person was Defendant Campbell, who exited as requested. Officer Hebert brought Campbell away from the vehicle for isolated questioning. Campbell identified himself and said he was from Brooklyn. He said he was in the area with the other guys visiting family. When asked whether he had been at Bull Moose earlier that morning, Campbell responded in the affirmative. When asked about the use of credit cards at Bull Moose, however, Campbell responded with a question, using words to the effect of "what credit cards." He subsequently denied being at Bull Moose and said he had been in the nearby Subway sandwich shop.

Meanwhile, Officer Gerrish patted down and handcuffed Defendant Barnes (the driver), based on Barnes's failure to produce a valid identification, and placed Barnes in Officer Hebert's cruiser. During the pat down, Officer Gerrish felt a plastic card in Barnes's front pocket and removed it. This card was an identification card in the name of Shawn Serlin.

Two other officers appeared on the scene roughly three minutes into Officer Gerrish's questioning of Barnes, while Barnes was still in the vehicle. Those additional officers were Sergeant Tom Chard of the South Portland Police Department and Officer Dalton, who previously was involved in the interview of the Bull Moose clerks. Also present on the scene was Chesca, Sergeant Chard's "K-9" partner, a Belgian Malinois certified in, among other things, evidence detection.[4] Sergeant Chard approached the vehicle (without Chesca) and asked

---

[3] This measure of time is also based on the video evidence, as are subsequent references to the timing of events.

[4] In addition to Sergeant Chard's testimony, evidence of Chesca's certifications is found in Government Exhibits 3 and 4. The latter exhibit is a "resume" of Chesca's past exploits, which defense counsel objected to as overly "self-serving." I have not placed any special weight on the representations found in this document and have relied, instead, on Sergeant Chard's testimony and Chesca's evidence-detection certification to conclude that her alerts were valid.

the remaining passenger, Defendant Porteous, to exit the vehicle. Mr. Porteous did so and they spoke at the side of the vehicle. When asked what the men were doing in the area, Porteous responded that his friends were looking for jobs. When asked, Porteous indicated that he had rented the vehicle. While Sergeant Chard was speaking with Porteous at the side of vehicle, Officer Gerrish entered the driver's side of the vehicle, front and back, and briefly looked over the passenger compartment. Next, he opened the vehicle's hatchback and briefly looked over the merchandise located there.[5]

Sergeant Chard asked Porteous whether he could "put" his dog in the car. Porteous responded with words to the effect of: "Yeah, you can put the dog in the car." Chard retrieved Chesca and let her into the vehicle. Chard observed what he understood to be signs that Chesca was "alerting" in three locations: the glove box, the front door pocket, and the center console. Chard proceeded to search these areas, without requesting any additional consent. To search the glove box Sergeant Chard had to use a vehicle key to unlock it. Inside the glove box, Sergeant Chard found a box, which he also opened. Inside the box were roughly 50 cards (both credit cards and identification cards) and three wallets. Sergeant Chard testified that the name of Shawn Collins was on several of the cards. As for the presence of drugs, Sergeant Chard found nothing more than marijuana residue where Chesca alerted. However, Chard also found cigar "blunts" in the vehicle, which he described as cigars with a hollowed out core, commonly used to smoke marijuana. Officer Gerrish testified, and I find, that he later observed ash in the driver's side, rear door pocket.

None of the officers provided any of the vehicle's occupants with a Miranda warning at any time during the stop. After discovering the box with the cards, the officers handcuffed

---

[5] The finding that Officer Gerrish entered the vehicle for a cursory search is also drawn from the video evidence.

Porteous and Campbell and transported the three men for processing. The officers also seized the vehicle and impounded it. The South Portland Police Department applied for a warrant to search the vehicle that afternoon. A Maine district court judge issued the warrant at roughly 4:03 p.m. that day. There was no indication at the hearing that the search conducted pursuant to the warrant turned up any additional evidence, though the warrant did confer authority to seize, among other things, credit cards in the name of Shawn Collins and game systems already known to be present in the car. (Gov't Ex. 5.)

## DISCUSSION

Defendants Campbell and Porteous contend that the evidence gathered from the vehicle and all statements they made at the scene must be suppressed because they were obtained in violation of the Constitution. According to these two defendants, the officers never had reasonable articulable suspicion to conduct a traffic stop; never obtained a valid basis to conduct a warrantless search of the vehicle; subjected Defendants to unwarned, custodial interrogation; and never developed probable cause to support their search warrant application. (Def. Porteous's Mot. to Suppress, Doc. No. 40; Def. Campbell's Mot. to Suppress, Doc. No. 42.) The Government says otherwise, contending that there was ample suspicion to support the traffic stop; that the questions addressed to Campbell and Porteous were not posed in a custodial environment, but rather in a common-place Terry-stop context; and that the warrantless search of the vehicle was lawful based on consent or, alternatively, based on the automobile exception because the officers had probable cause to believe the vehicle contained drugs or contraband credit cards. (Gov't Opposition, Doc. No. 47.)

**A.     The Traffic Stop**

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. United States v. Arvizu, 534 U.S. 266, 273 (2002) (citing Terry v. Ohio, 392 U.S. 1, 9 (1968)). Law enforcement officers may conduct brief investigatory stops, including traffic stops, when they are able "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. When officers are cognizant of facts that, viewed objectively, would lead a reasonable person to believe that "criminal activity may be afoot," id. at 30, they may stop and detain private citizens to investigate. Id. at 21-22. Probable cause to make an arrest is not required for this, but mere "inarticulate hunches" will not suffice. Id. at 22. The fact that suspects are traveling in a motor vehicle does not raise the Government's burden. Arizona v. Johnson, 555 U.S. 323, 327 (2009). Once a vehicle is stopped based on reasonable articulable suspicion, officers may instruct the driver and passengers to exit the vehicle without running afoul of the Fourth Amendment. Id. at 331 (citing Maryland v. Wilson, 519 U.S. 408, 415 (1997) (passengers), and Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977) (per curiam) (driver)).[6]

Defendants argue that the officers stopped and detained them based on a mere hunch or, worse, based on racial profiling. The facts do not support either contention. The traffic stop was supported by reasonable articulable suspicion that Defendants had engaged in fraudulent credit card transactions at Bull Moose and were continuing with that activity at Toys R Us. This

---

[6]     The United States did not offer testimony to the effect that the officers had reasonable suspicions that Barnes, Campbell, or Porteous may be armed and dangerous. The Supreme Court has held that the frisk portion of a "stop and frisk" calls for a separate inquiry. Arizona v. Johnson, 555 U.S. at 323, 332. Here, however, there is no indication that the officers obtained any incriminating evidence as a result of frisking the moving defendants and the moving defendants have not raised any challenge related to being frisked.

suspicion was not based on the color of Defendants' skin, but on the suspicious nature of their activity at Bull Moose, which was sufficient to cause two store clerks to suspect that criminal activity was afoot and would reasonably have caused any prudent person to suspect the fraudulent use of credit cards to purchase high-demand consumer electronics. Defense counsel noted that the use of another person's credit card is not illegal, if the use is permitted, and suggested that Defendants were not given the benefit of the doubt merely because of the color of their skin. That is not a fair characterization of what transpired. Defendants' conduct was particularly suspicious because they presented themselves at the store in a serial fashion, even though they were travelling together, and two different men presented credit cards bearing the same name. The second man presented two credit cards, both of which were declined. Thereafter, a third man in their party seemed intent on repeating the procedure and, like the other two, desired to purchase multiple game systems. Any reasonable person who was paying attention, as these store clerks were, would believe that criminal activity may be afoot. The fact that the men departed in a vehicle with a New York license plate could only increase the suspicion. Had all three men been white, their conduct would have been no less suspicious. The roadside detention was reasonable under these circumstances.

In a supplemental memorandum (Doc. No. 69), Defendants assert that a review of the dispatch recordings[7] undermines the idea that the officers could articulate a reasonable suspicion of criminal activity or reliably identify the SUV described by the Bull Moose clerks. I do not find these arguments persuasive. The fact that one could imagine a scenario in which the Defendants' actions at Bull Moose were legitimate does not preclude a finding of reasonable suspicion. Officer Hebert had sufficient, reliable information to articulate reasonable suspicion

---

[7] The parties have introduced supplemental joint exhibits 1 and 2. These exhibits are transcripts of, respectively, the Scarborough Police Department dispatch recording and the South Portland Police Department dispatch recording, which were admitted at the hearing in audio format.

9

and justify a traffic stop.[8]  Moreover, Officer Gerrish reliably identified the vehicle based on the SUV description, the fact that it was in the Toys R Us parking lot, the license plate number,[9] and the fact that it was transporting three black males.  The balance of the points made by Defendants Campbell and Porteous (that there was no report of suspicious activity from Toys R Us;  that officers could have run the plates and followed the vehicle;  that the rental car company could have been called to determine the names of the renters;  that area businesses could have been interviewed) are similarly unavailing.

**B.      Unwarned Questioning**

Defendants Campbell and Porteous contend that their statements to the officers must be excluded because they were obtained without Miranda warnings.  The rule of Miranda v. Arizona, 384 U.S. 436 (1965), requires that warnings be administered to criminal suspects in advance of "custodial interrogation" in order to safeguard the Fifth Amendment privilege against self-incrimination.  United States v. Lopez, 380 F.3d 538, 545 (1st Cir. 2004).  For Defendants' motions to succeed, it must be apparent that they were in custody at the time of their unwarned statements.  United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011).  For purposes of the Fifth Amendment, "in custody" means that a person has been formally arrested or has had his freedom of movement restrained to the degree associated with a formal arrest.  Id.  Whether the restraint on movement is sufficient to rise to the level of an arrest depends on the objective circumstances and how they would be perceived by a reasonable person standing in the shoes of

---

[8]      The transcript of the South Portland dispatch recording reflects that Officer Gerrish had some "direct" communication with Officer Hebert prior to the traffic stop (Joint Ex. 2 at 2), which is consistent with the testimony elicited at the hearing.  In any event, the Government does not have to prove that Officer Gerrish could personally articulate a reasonable suspicion of criminal activity, even though he is the officer who made the stop.  It is enough that one of the officers involved in the investigation could do so.  United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002).

[9]      The transcript of the Scarborough dispatch recording reflects that the registration number taken from the clerks was FFE 2099 and that the vehicle's actual registration number was FFE 2909. (Joint Ex. 1 at 2.)  This is certainly a reliable match, standing alone, for purposes of vehicle identification.

the suspect. Id.; United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996). "Relevant circumstances include whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Ventura, 85 F.3d at 711 (quotation marks and citation omitted).

Neither the questioning that Officer Hebert conducted of Defendant Campbell nor the questioning Sergeant Chard conducted of Defendant Porteous rose to the level of custodial interrogation.[10] The questioning took place in a hotel parking lot, the men were not restrained, and the duration of the encounter was not excessive. Although Defendants were outnumbered by the officers, they were not crowded by the officers or even double-teamed during questioning. The Defendants likely observed Officer Gerrish restraining Defendant Barnes and placing him inside a cruiser, but they would have been aware that Barnes was driving, had not produced any identification or driver's license when Officer Gerrish first approached the vehicle, and had indicated that his license was likely suspended. There was no message implicit in the act of arresting Barnes that the others would be taken into custody, too. In light of all of the facts and circumstances, a reasonable person standing in their shoes would not have believed that he was being subjected to a restraint equivalent to a formal arrest.

C.   **The Vehicle Search**

The Fourth Amendment prohibits the federal authorities from conducting unreasonable searches. U.S. Const. amend. IV. This prohibition applies equally to state authorities by virtue of the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 655-56 (1961). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se*

---

[10]   Barnes is not a movant and, consequently, I do not offer any assessment about Officer Gerrish's conversation with him in relation to the custodial interrogation standard.

unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnote omitted). An officer is not free to conduct a "field-type" search of a vehicle's passenger compartment as part of every routine traffic stop. Knowles v. Iowa, 525 U.S. 113, 114 (1998). This is so even if there has been a civil traffic violation and state law gives the officer the discretionary authority to make an arrest. Id. However, exceptions to this general rule arise when there is an arrest of an occupant, when an occupant consents to a search, or when there is probable cause to expect that the vehicle contains evidence of criminal activity, as discussed below.

   *1.     Search incident to arrest*

The first exception to the warrant requirement allows an officer to search a vehicle's passenger compartment pursuant to a "formal" or "custodial" arrest. Id. at 117-18. This exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations," Arizona v. Gant, 556 U.S. 332, ___, 129 S. C.t 1710, 1716 (2009), and grows out of an exigency exception previously applied in the context of searches made incident to an arrest in the home, Chimel v. California, 395 U.S. 752 (1969) (describing the development of the exception). This exception is restricted to scenarios in which the passenger compartment of the vehicle is within the arrestee's immediate control and extends to containers found inside the vehicle. New York v. Belton, 453 U.S. 454, 460, 462-63 (1981). However, this exception "does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." Gant, 129 S. Ct. at 1714. Moreover, this exception arises only when there is a reasonable threat to officer safety or where there is reason to believe that the vehicle contains "evidence of the offense of arrest." Id.

Turning to the facts of the instant case, Defendant Barnes was removed from the vehicle, arrested, and handcuffed for operating after suspension. Although Defendants Campbell and Porteous were not restrained by handcuffs, they had been patted down for weapons and moved away from the vehicle at the time of the search and each was being attended to by a different officer on the scene. No officer has testified that he suspected the vehicle to contain evidence of operating after suspension, an unlikely proposition, or that a safety exigency existed that would justify an exploratory search of the locked glove box and a container found within it. Consequently, this particular exception to the warrant requirement is not available here.

### 2. *Consent*

The second exception to the warrant requirement is search by consent. "It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Officers need not have a warrant to search when a person has authority to give consent to a search and freely and voluntarily gives consent. United States v. Jones, 523 F.3d 31, 37 (1st Cir. 2008). "The assessment of whether consent is free and voluntary is a question of fact that requires an examination of the totality of the circumstances surrounding the relevant transaction between law-enforcement authorities and the consenting party." Id.; see also Ohio v. Robinette, 519 U.S. 33, 39-40 (1996). If the evidence demonstrates that consent was not "the product of duress or coercion, express or implied," Schneckloth, 412 U.S. at 227, voluntariness is ordinarily established. However, additional factors such as age or lack of knowledge or intelligence may preclude a finding that consent was given voluntarily. Cf. J.D.B. v. North Carolina, 131 S. Ct. 2394 (2011) (involving unwarned statements made by a 13-year-old student).

13

A consent search is reasonable so long as it remains within the scope of the consent given. Jones, 523 F.3d at 38. To determine the scope of a consent, a court must determine what a typical reasonable person would have understood based on the overall context of the exchange between the consenting party and the officer. Id. at 38-39. If it is objectively reasonable for an officer to believe that the scope of consent extends to a particular place or container, the officer is permitted to search the same. Florida v. Jimenez, 500 U.S. 248, 251 (1991). For example, consenting to a search of a vehicle's passenger compartment for contraband drugs, without placing any limitation on the scope of the search, will justify a search of containers found inside the vehicle that could contain the drugs. Id.; United States v. Forbes, 181 F.3d 1, 7 (1st Cir. 1999).

The United States justifies the search of the glove box, in part, based on Defendant Porteous's consent to having Sergeant Chard put his canine partner in the vehicle. However, that consent extended only so far as to having the dog put into the car. As to that degree of intrusion on Defendants' privacy, the totality of the circumstances depict a voluntary consent. Defendant Porteous was not subject to the pressures of a custodial interrogation and was not restrained, even if he was not free to go. The officers did have a commanding presence at the time of Porteous's consent, but that presence was not overbearing on Porteous and was calibrated to the fact that three suspects were present at the scene. An adult American citizen of common intelligence and constitution would not have been so overwhelmed by the pressures of this traffic stop to be unable to withhold consent to having a dog run through his or her vehicle. As the pronounced renter of the vehicle, Defendant Porteous gave valid consent to Sergeant Chard to introduce Chesca to the passenger compartment. United States v. Matlock, 415 U.S. 164, 170

14

(1974) (recognizing that one with common authority over premises may consent to a search).[11] Chesca's subsequent alert opened the door for application of yet another exception to the warrant requirement.

### 3. *The automobile exception*

The third exception to the warrant requirement is commonly referred to as the "automobile exception." Pursuant to this exception, officers "who have legitimately stopped an automobile and who have probable cause to believe that contraband is concealed somewhere within it" are permitted to "conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant." United States v. Ross, 456 U.S. 798, 800 (1982). This exception is grounded on the fact that ,"historically[,] warrantless searches of vessels, wagons, and carriages—as opposed to fixed premises such as a home or other building—had been considered reasonable by Congress." Id. at 805. According to the Supreme Court: "individuals always had been on notice that movable vessels may be stopped and searched on facts giving rise to probable cause that the vehicle contains contraband, without the protection afforded by a magistrate's prior evaluation of those facts." Id. at 807 n.8. "Given the nature of an automobile in transit . . . an immediate intrusion is necessary [and] a warrantless search of an automobile is not unreasonable." Id. at 806-807. Because this exception is premised on probable cause, officers must have knowledge of objective facts sufficient to justify the issuance of a warrant to search the vehicle. Id. at 808-809. Where there is probable cause to search an entire vehicle, officers may also search containers and packages found inside the vehicle that "might contain the object of the search." Id. at 821. "The scope of a warrantless search based on probable cause is no

---

[11] Compare Georgia v. Randolph, 547 U.S. 103 (2006) (holding that a consent search of a residence was unreasonable when a wife gave consent to search but her husband, also present on the scene, vocalized his objection and expressly refused consent). The officers in this case did not give every occupant of the vehicle a chance to be heard on the dog-sniff search of the interior of the vehicle, but I am unaware of any precedent requiring them to poll all of the occupants of a vehicle to ensure that none objects.

15

narrower—and no broader—than the scope of a search authorized by a warrant supported by probable cause." Id. at 823. See also United States v. Lopez, 380 F.3d 538, 544-45 (1st Cir. 2005). "Probable cause exists where 'the facts and circumstances within [the knowledge of officers] of which they had reasonably trustworthy information are sufficient . . . to warrant a man of reasonable caution in the belief'" that an offense has been committed or that contraband is present. Brinegar v. United States, 338 U.S. 160, 175-176 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)).

Defendants contend that the officers lacked probable cause to believe that the vehicle contained evidence of criminal activity. The Government disagrees and offers three viable solutions to the issue. First, it responds that the officers had probable cause to search the glove box because Defendant Porteous consented to Sergeant Chard's request to put Chesca in the car and the officers gained probable cause to search the glove box for contraband substances when Chesca alerted on the glove box. (Gov't Opposition at 9.) Second, the Government asserts that Officer Gerrish's detection of the smell of marijuana alone supplied sufficient probable cause to search the passenger compartment and containers found therein. (Id. at 10.) Third, the Government maintains that the officers' evolving investigation into credit card fraud generated probable cause to believe the vehicle contained evidence of that criminal activity. (Id. at 10 n. 9.) There is legal authority and a solid factual basis for each of these alternatives.

  a. Chesca's alert

Because Defendant Porteous provided a valid consent to admitting Chesca into the interior of the vehicle, her subsequent alert on the glove box provided probable cause to believe that the glove box held contraband drugs. See Illinois v. Caballes, 543 U.S. 405, 409 (2005) (holding that dog sniff supplied probable cause to search vehicle's trunk).

16

b. The smell of marijuana

The Government argues that it need not rely on Chesca's olfactory prowess and that the officers had probable cause to search the passenger compartment and glove box based on Officer Gerrish's mere human sensibilities. The Maine Supreme Judicial Court has held that an officer's detection of the smell of marijuana coming from a vehicle and "furtive behavior" on the part of the vehicle's occupants supply probable cause to search a vehicle. State v. Ireland, 706 A.2d 597, 601 (Me. 1998). It has also held that the smell of burned marijuana, standing alone, provides probable cause to believe that a vehicle contains marijuana. State v. Barclay, 398 A.2d 794, 797 (Me. 1979). Officer Gerrish testified that his training included training on the detection of marijuana by smell. Officer Gerrish's detection of the smell of marijuana upon his first encounter with the vehicle's occupants, through an open window, supplied probable cause for him to search the vehicle for evidence of marijuana. This is a logical corollary to the use of a trained dog's alert to supply probable cause for a vehicle search and is equally appropriate in the context of the automobile exception to the warrant requirement.

c. Evolving evidence of theft by fraudulent use of credit cards

Finally, the Government maintains that the evidence within the officers' collective knowledge supplied probable cause to believe that the occupants of the vehicle were the men who had occasioned the Bull Moose report and that evidence of criminal activity involving fraudulent credit cards or credit card usage would be found inside the vehicle. A probable cause determination can be supported by resort to the collective fund of knowledge possessed by all of the officers participating in an investigation. United States v. Paradis, 802 F.2d 553, 557 (1st Cir. 1986). In this particular case, probable cause arises based on the extremely suspicious use of the "Shawn Collins" credit cards at Bull Moose; the focus on buying multiple high-demand

electronic game systems; discovery of the vehicle and its occupants at the Toys R Us store, which corroborated their earlier presence at Bull Moose; Defendant Barnes's denial that they were ever at the Bull Moose store and his denial about having any credit card in his possession; Defendant Campbell's initial admission that they had been at Bull Moose coupled with his later denial about being at the store and his evasive response when asked about the use of credit cards; and the contradictory stories given by all three men about why they were in the area. When all of these facts and circumstances are considered together, a person of reasonable caution would be justified in the belief that one or more of the occupants of the vehicle had committed criminal offenses involving credit card transactions and that evidence of those offenses would be found somewhere in the vehicle. Given the physical size of credit cards, a search of the glove box was a reasonable intrusion. The Government's argument that the smell of marijuana, by either man or beast, was not essential to the search of the glove box is sound. The automobile exception permitted this intrusion because there was probable cause to believe that evidence of the charged offense was located inside the vehicle.

**D.      The Warrant**

Lastly, Defendants Campbell and Porteous contend that the search warrant should not have issued for want of probable cause. The magistrate's task in this regard was "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there [was] a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). For reasons already explained probable cause called for issuance of the warrant.

18

## Conclusion

For the reasons set forth above, I RECOMMEND that the Court DENY Defendant Porteous's Motion to Suppress (Doc. No. 40) and DENY Defendant Campbell's Motion to Suppress (Doc. No. 42).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 6, 2011